[No. B070561. Second Dist., Div. Two. May 5, 1993.]

HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Plaintiffs and Appellants, v.
WHITTIER UNION HIGH SCHOOL DISTRICT et al., Defendants and Respondents.

**COUNSEL**

Kaplanis & Grimm, Trevor A. Grimm and Jonathan M. Coupal for Plaintiffs and Appellants.

Bell & Hiltachk and Thomas W. Hiltachk as Amici Curiae on behalf of Plaintiffs and Appellants.

Richards, Watson & Gershon and Marsha Jones Moutrie for Defendants and Respondents.

Breon, O'Donnell, Miller, Brown & Dannis and Priscilla Brown as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**GATES, J.**—The instant case presents an issue of first impression, i.e.: May school districts qualify as "special districts" within the meaning of the Landscaping and Lighting Act of 1972 (the Act)? (Sts. & Hy. Code, § 22500 et seq.) The trial court concluded they do and entered summary judgment in favor of defendants Whittier Union High School District and Bonita Unified

School District. Plaintiffs Howard Jarvis Taxpayers Association et al. appeal, challenging that determination.[1]

Respondent Whittier Union High School District owns and operates the facilities and grounds at six high schools located within its established geographic boundaries. Respondent Bonita Unified School District owns and operates a total of 13 elementary, middle and high schools serving the area within its established boundaries. The facilities and grounds at these various locales include auditoriums, meeting rooms, gymnasiums, stadiums, tracks, playing fields, courts and swimming pools.

A majority of the time the foregoing facilities serve as recreation and civic centers for groups and individuals who live and work within the school districts' geographic boundaries. The activities engaged in by community members are numerous and varied: meetings involving groups like the Boy Scouts, Girl Scouts and Camp Fire Girls; classes ranging from crafts and dance instruction to music and reading programs; day care programs; drama productions and musicals; and numerous sports activities, such as regularly scheduled soccer, football and baseball league play and practice, "pick-up" basketball games, volleyball, tennis, jogging and individual workouts.

As a result of the constant, heavy community use of the facilities and grounds during nonschool hours, they have deteriorated and are in need of a number of improvements: installation and replacement of night lighting, fencing and retaining walls; renovation of grandstands and seating; repair and resurfacing of blacktops, playing fields and running track facilities; regrading, reseeding and other general field improvements; refinishing of gymnasium floors; and installation of sprinkler systems.

Lacking sufficient funds to finance the needed improvements, respondents in 1991 initiated proceedings to form special assessment districts under the Act. The proceedings culminated in July 1991 with the adoption of separate resolutions ordering the formation of recreation improvement and maintenance districts encompassing all of the parcels located within the school districts' geographic boundaries.

The Act prescribes procedures for the formation of special assessment districts and the levy and collection of assessments to fund the installation,

---

[1]A second contention urged by appellants, that "[r]espondents' 'assessments' are actually thinly disguised per parcel property taxes which are invalid for failure to receive a two-thirds vote as required by Proposition 13," has been abandoned in light of our Supreme Court's recent decision in *Knox* v. *City of Orland* (1992) 4 Cal.4th 132 [14 Cal.Rptr.2d 159, 841 P.2d 144].

construction, maintenance and acquisition of specified improvements. Assessment districts may be formed by local agencies, which are defined to include, "a county, a city and county, a city, *a special district,* or an agency or entity created pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1 of the Government Code and made up solely of local agencies whose annual taxes are carried on the county assessment roll and are collected by the county." (Sts. & Hy. Code, § 22530; italics added.) " 'Special district' means any public corporation, other than a county or a city, formed pursuant to general law or special act for the local performance of governmental or proprietary functions within limited boundaries and which is authorized by such law or act to make any of the improvements or to furnish the maintenance or services provided for in this part." (Sts. & Hy. Code, § 22539.)[2]

It has long been recognized that school districts represent a type of nonmunicipal public corporation which "derives its authority directly from the legislature, through the general law providing for the establishment of schools throughout the state," and performs its services locally within a limited geographic area. (*Ward* v. *San Diego School Dist.* (1928) 203 Cal. 712, 715 [265 P. 821]; *Kennedy* v. *Miller* (1893) 97 Cal. 429 [32 P. 558]; *California Teachers Assn.* v. *Hayes* (1992) 5 Cal.App.4th 1513, 1524 [7 Cal.Rptr.2d 699]; *Yreka etc. School Dist.* v. *Siskiyou etc.* (1964) 227 Cal.App.2d 666, 670 [39 Cal.Rptr. 112]. See also 45 Cal.Jur.3d, Municipalities, § 5, pp. 25-27.)

---

[2]Section 22525 of Streets and Highways Code defines "improvement" as "one or any combination of the following:

"(a)   The installation or planting of landscaping.

"(b)   The installation or construction of statuary, fountains, and other ornamental structures and facilities.

"(c)   The installation or construction of public lighting facilities, including, but not limited to, traffic signals.

"(d)   The installation or construction of any facilities which are appurtenant to any of the foregoing or which are necessary or convenient for the maintenance or servicing thereof, including, but not limited to, grading, clearing, removal of debris, the installation or construction of curbs, gutters, walls, sidewalks, or paving, or water, irrigation, drainage, or electrical facilities.

"(e)   The installation of park or recreational improvements, including, but not limited to, all of the following:

"(1)   Land preparation, such as grading, leveling, cutting and filling, sod, landscaping, irrigation systems, sidewalks, and drainage.

"(2)   Lights, playground equipment, play courts, and public restrooms.

"(f)   The maintenance or servicing, or both, of any of the foregoing.

"(g)   The acquisition of land for park, recreational, or open-space purposes.

"(h)   The acquisition of any existing improvement otherwise authorized pursuant to this section."

It is also manifest that school districts are authorized to make the types of improvements and to furnish the maintenance and servicing provided for in the Act. (See fn. 2, *ante*.) They possess broad statutory powers, including the right of their governing boards to "initiate and carry on any program, activity, or . . . otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." (Ed. Code, § 35160.) Any doubts that may have existed regarding the scope of authority granted to school districts under section 35160 of the Education Code were laid to rest by portions of Senate Bill No. 998, enacted as chapter 1452 of Statutes 1987.[3]

■ Not only was respondents' formation of recreation improvement and maintenance districts consistent with the general authority of Education

---

[3]The uncodified legislative intent section of the bill states:

"The Legislature finds and declares that, in 1972, the people of the state adopted an amendment to Section 14 of Article IX of the California Constitution, which permits the Legislature to authorize the governing boards of school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established.

"It is the intent of the Legislature, in enacting this act, to implement more fully, for the school districts, county boards of education, and the county offices of education in California, the intent of the people in adopting the amendment of Section 14 of Article IX of the California Constitution. The Legislature further finds and declares that, in order to do so, it is necessary to amend or repeal many provisions of the Education Code.

"Whenever in this act a power, authorization, or duty of a school district governing board, county board of education, or county office of education, is repealed or otherwise deleted by amendment, it is not the intent of the Legislature to prohibit the board or office from acting as prescribed by the deleted provisions. Rather, it is the intent of the Legislature, that the school district governing boards, county boards of education, and county superintendents of schools, respectively, shall have the power, in the absence of other legislation, to so act under the general authority of Section 35160 of the Education Code." (Stats. 1987, ch. 1452, § 1, pp. 5398-5399.)

Section 199 of the bill (Stats. 1987, ch.1452 § 199, p. 5427) added section 35160.1 to the Education Code. It reads:

"(a) The Legislature finds and declares that school districts, county boards of education, and county superintendents of schools have diverse needs unique to their individual communities and programs. Moreover, in addressing their needs, common as well as unique, school districts, county boards of education, and county superintendents of schools should have the flexibility to create their own unique solutions.

"(b) In enacting Section 35160, it is the intent of the Legislature to give school districts, county boards of education, and county superintendents of schools broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective.

"(c) The Legislature further declares that the adoption of this section is a clarification of existing law under Section 35160."

Code section 35160, it was entirely in keeping with the express statutory authority of school districts to make school facilities and grounds available for public use as civic centers. ■ The legislative purpose of the Civic Center Act (Ed. Code, § 40040 et seq.) is "to make school buildings centers of free public assembly insofar as such assembly does not encroach upon the educational activities, which constitute the primary purpose of the schools." (*Ellis* v. *Board of Education* (1945) 27 Cal.2d 322, 329 [164 P.2d 1].)[4]

■ In addition, respondents' formation of recreation improvement and maintenance districts helps ensure there will be "adequate programs of community recreation" (Ed. Code, § 10900, subd. (a)), a goal the Legislature sought to achieve by authorizing school districts "to organize, promote, and conduct programs of community recreation as will contribute to the attainment of general educational and recreational objectives for children and adults of the state." (Ed. Code, § 10900, subd. (b).)[5]

---

[4]Section 40041 of the Education Code provides in pertinent part:

"(a) There is a civic center at each and every public school facility and grounds within the state where the citizens, parent-teachers' associations, camp fire girls, boy scout troops, farmers' organizations, school-community advisory councils, senior citizens' organizations, clubs, and associations formed for recreational, educational, political, economic, artistic, or moral activities of the public school districts may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment pertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside.

"(b) The governing board of any school district may grant the use of school facilities or grounds as a civic center upon the terms and conditions the board deems proper, subject to the limitations, requirements, and restrictions set forth in this article, for any of the following purposes:

"(1) Public, literary, scientific, recreational, educational, or public agency meetings.

" . . . . . . . . . . . . . . . . . . . . . . . .

"(7) Other purposes deemed appropriate by the governing board."

[5]The Legislature has further specified that "[t]he governing body of every public authority may do all of the following: [¶] (a) Organize, promote, and conduct programs of community recreation. [¶] (b) Establish systems of playgrounds and recreation. [¶] (c) Acquire, construct, improve, maintain, and operate recreation centers within or without the territorial limits of the public authority. . . ." (Ed. Code, § 10902.)

Moreover, the Legislature has prescribed that "[t]he governing body of any school district may use the buildings, grounds, and equipment of the district, or any of them, to carry out the purposes of this chapter, or may grant the use of any building, grounds, or equipment of the district to any other public authority for the purposes, whenever the use of the buildings, grounds; [*sic*] or equipment for community recreational purposes will not interfere with use of the buildings, grounds, and equipment for any other purpose of the public school system. Nothing in this section is intended to repeal any provision of, or to restrict or otherwise affect the use of school buildings under Sections 40040 to 40058, inclusive." (Ed. Code, § 10910.)

None of the arguments raised by appellants or by amicus curiae on appellants' behalf persuade us that respondents should not be treated as "special districts" within the meaning of the Act. We have been presented with an opinion letter to former Assemblyman Nolan Frizzelle dated July 2, 1991, in which the Legislative Counsel opines, "it seems questionable whether the term 'special district' in the [A]ct was intended to refer to and include school districts." The Legislative Counsel apparently arrived at this conclusion based on the misapprehension that "the authority of a school district to provide athletic and recreational facilities, and to furnish lighting therefor, *must be in promotion of the district's educational functions. . . .*" (Italics added.) This is incorrect. Educational operations are, of course, a school district's primary responsibility. Nonetheless, as we have seen, school districts also serve an important secondary function as providers of recreational facilities for the community. (See Ed. Code, §§ 10900 et seq., 40040 et seq.) This purpose was entirely overlooked by the Legislative Counsel, resulting in a flawed analysis of the "special district" issue.

Appellants claim the absence of any reference to school districts in the express language of the Act or its legislative history demonstrates the Legislature never intended the Act to be used by school districts. We disagree. Regardless of its genesis,[6] the bill as drafted and enacted did not limit the legislation's application to cities, counties, or cities and counties, but extended it to "special districts" as well. Although the meaning of the latter term is not discussed in the legislative history of the Act, the definition set forth in section 22530 of the Streets and Highways Code is certainly broad enough to encompass school districts.

Appellants' contention that interpreting Streets and Highway Code section 22530 to include school districts is "untenable" because it would render language in another unrelated statutory scheme "mere surplusage" is itself untenable. As respondents quite correctly point out, the Legislature has employed the term "special district" in a number of different ways on different occasions. No attempt need be made to reconcile them all. We need concern ourselves only with the meaning of the term as it is used in the legislation under review. This can be accomplished without resort to the rule that courts should avoid constructions that make some words in an act surplusage. (*Woosley* v. *State of California* (1992) 3 Cal.4th 758, 776 [13 Cal.Rptr.2d 30, 838 P.2d 758].)

Equally unavailing is appellants' suggestion that construing the Act to include school districts may result in constitutional violations. In *Serrano* v.

---

[6]It seems clear, as appellants assert, that the Act was not conceived with school districts in mind. Former Assemblyman Robert Beverly authored the legislation in response to a request from the City of Manhattan Beach to develop a mechanism for financing the planning and maintenance of landscaping projects located on public rights of way without relying on an ad valorem property tax levy or the city's general operating funds.

*Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], cited by appellants, our Supreme Court declared invalid the state public school financing system there under review because the quality of educational opportunity available to the student was dependent on the wealth of the district in which he or she lived. Unlike the situation in *Serrano, supra,* the charges at issue in our case are not "taxes" based upon the assessed valuation of the real property within the affected districts. Rather, they are "special assessments" which have been levied against that property in order to recoup the cost of the improvements " 'made for the special benefit' " of the property. (*Knox* v. *City of Orland, supra,* 4 Cal.4th at p. 142.) That being so, it cannot be said that the assessments are based on the wealth of district residents.

In addition, the assessments are being levied not for educational purposes, but to finance recreational improvements to certain school facilities and grounds used for community recreational purposes during nonschool hours. Respondents calculated the percentage of total facilities usage attributable to community activities in order to determine what percentage of the total improvement costs would be financed by the special assessments. Those facilities costs associated with school usage are not being financed by the assessment funds. The infirmity which existed in *Serrano, supra,* is therefore not present here.

Neither is there a basis for concluding there has been a violation of the free school guarantee. (Cal. Const., art. IX, § 5.) The special assessments respondents seek to levy are statutorily authorized and are more in the nature of "noneducational supplemental services" (*Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 263 [5 Cal.Rptr.2d 545, 825 P.2d 438]) than activities which constitute "an integral, fundamental part of education or a necessary element of any school's activity . . . ." (*Id.,* at p. 262. See also *Hartzell* v. *Connell* (1984) 35 Cal.3d 899, 911 [201 Cal.Rptr. 601, 679 P.2d 35].)

The judgment is affirmed.

Boren, P. J., and Fukuto, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 22, 1993.