TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 96-809 |
| of | : | |
| | : | June 16, 1997 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE VALERIE BROWN, MEMBER OF THE CALIFORNIA STATE SENATE, has requested an opinion on the following questions:

1.          May a school district prohibit all commercial motion picture studios from filming movies on school property?

2.          May a school district that permits commercial motion picture studios to film movies on school property deny permission to film certain movies based solely upon their content?

## CONCLUSIONS

1.          A school district may prohibit all commercial motion picture studios from filming movies on school property.

2.          A school district that permits commercial motion picture studios to film movies on school property may deny permission to film certain movies based solely upon their content so long as its actions are reasonably related to legitimate pedagogical concerns.

## ANALYSIS

We are informed that a school district has been contacted by a motion picture studio to film a movie at one of the district's schools. Must the district allow the filming of the movie on school property? Assuming it has allowed the filming of some movies in the past, may it deny the filming of this particular movie based upon its subject matter?

### 1.          Prohibiting All Filming on School Property

The first question to be resolved is whether a school district may refuse to allow any filming of movies on school property. We conclude that it may so refuse.

We begin our analysis by noting that the movie industry has been recognized by the Legislature as being significant to the economy of the state. Under the terms of the Motion Picture, Television, and Commercial Industries Act of 1984 (Gov. Code, §§ 14998-14998.10), the Legislature has addressed the "need for concerted efforts by California state and local governments to provide an environment supportive of, and conducive to, the undertakings of the motion picture industry in this state." (Gov. Code, § 14998.1.) Government Code section 14998.10 states in part: "It is the intent of the Legislature to encourage local governments to develop uniform procedures for issuing permits and to charge fees for the use of agency property . . . which do not exceed the estimated costs of providing the property . . . for which the fees are charged." **Footnote No. 1** Nothing in this legislative scheme, however, may be construed as *requiring* a school district to permit the filming of a movie on school property. An intent "to encourage" does not create a statutory mandate.

School districts are expressly authorized to rent their school facilities to commercial firms, among others, as long as the use does not interfere with the school's educational programs, disrupt surrounding residential neighborhoods, or jeopardize the safety of the students. (Ed. Code, §§ 39470-39478.) **Footnote No. 2** We may assume for our purposes that the filming of the movie in question would not interfere, disrupt, or jeopardize safety for the school or surrounding neighborhood. Nevertheless, this specific statutory grant of authority is not mandatory even when such conditions have been met. "The governing board of any school district may enter into agreements to make . . . school buildings available for rent . . ." (§ 39470, subd. (a).) Under this legislative scheme the school district would not be *required* to rent its property to a motion picture studio for the filming of a movie. (See *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 463 ["It is a well-settled principle of statutory construction that the word `may' is ordinarily construed as permissive . . ."]; *In re Richard E.* (1978) 21 Cal.3d 349, 354 ["The ordinary import of `may' is a grant of discretion"].)

Under a third statutory scheme, the Civic Center Act (§§ 40040-40048), a school district must make available at each school site an area where members of the public "may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment pertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside." (§ 40041, subd. (a); see *Howard Jarvis Taxpayers Assn.* v. *Whittier Union High School Dist.* (1993) 15 Cal.App.4th 730, 735.) However, only a limited area on school property is required to be made a "civic center" for "public forum" purposes. (75 Ops.Cal.Atty.Gen. 232, 235-238 (1992); see *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 540; *Goodman* v. *Board of Education* (1941) 48 Cal.App.2d 731, 734-738.) Here we are not concerned with the filming of a movie within the limited "civic center" area of a school. Rather, the entire school property would provide the background scenes for the production. Nothing in the Civic Center Act would *require* a school district to allow movies to be filmed on its property in such circumstances. **Footnote No. 3**

If there is no *statutory* right to film a movie on school property, would the motion picture studio nevertheless have a *constitutional* right to use school property for its production of a movie? The First Amendment of the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." This restriction against the exercise of federal power is applicable to state and local governments, including school districts, by virtue of the due process clause of the Fourteenth Amendment. (See *Hazelwood School District* v. *Kuhlmeier* (1987) 484 U.S. 260, 266; *Everson* v. *Board of Educ.* (1947) 330 U.S. 1, 8; 77 Ops.Cal.Atty.Gen. 56, 57-58 (1994).)

Similar to the federal Constitution, subdivision (a) of section 2 of article I of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." The California Constitution has been construed as being more protective of First Amendment rights than the federal Constitution. (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 519; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 903, 907-910; *Wilson* v. *Superior Court* (1975) 13 Cal.3d

652, 658; *Women's Internat. League Etc. Freedom* v. *City of Fresno* (1986) 186 Cal.App.3d 30, 37-38.) Nevertheless we believe that an examination of the issues to be resolved herein requires similar treatment under the two Constitutions. (See *California Teachers Assn* v. *Governing Board* (1996) 45 Cal.App.4th 1383, 1391-1392; *Savage* v. *Trammell Crow Con., Inc.* (1990) 223 Cal.App.3d 1562, 1572-1573; *U.C. Nuclear Weapons Lab conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1164-1165.)

The *showing* of a movie on school property is clearly subject to First Amendment analysis as a "communication" or "expressive activity." (See *Lamb's Chapel* v. *Center Moriches Union Free School Dist.* (1993) 508 U.S. 384.) While we are doubtful that using school property essentially as a stage prop in the *filming* of a movie [(see *Amato* v. *Wilentz* (3rd Cir. 1991) 952 F.2d 742, 747)] would constitute an equivalent type of activity, we will, for the sake of resolving any First Amendment issues, assume without deciding that a stage prop in a movie is part of its content. Government restrictions on the content of expressive activity (filming a movie) are generally subject to review under First Amendment standards. (See *Freedman* v. *Maryland* (1965) 380 U.S. 51; *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 502-503; *People* v. *Freeman* (1988) 46 Cal.3d 419, 425-427.) **Footnote No. 4**

We may assume for purposes of our discussion that the content of the movie in question would not be obscene, defamatory, or contain any expression "`not within the area of constitutionally protected speech.'" (*R.A.V.* v. *St. Paul* (1992) 505 U.S. 377, 383.) We will also assume that the filming of the movie would not disrupt the conduct of the school's educational programs, jeopardize the children's physical safety, or unduly interfere with the surrounding neighbors' activities. (See §§ 39472, 40042; *Rodriquez* v. *Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 715; 79 Ops.Cal.Atty.Gen. 58, 63 (1996).)

Even with these assumptions, the question whether the owners of a motion picture studio have a constitutional right to film a movie on school property is easily answered. In *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, *supra*, 508 U.S. at 390-391, the court explained in following a long line of cases:

"There is no question that the District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated. [Citations.] It is also common ground that the District need not have permitted after-hours use of its property for any of the uses permitted by . . . the state education law."

Accordingly, for purposes of the First Amendment, school property may be restricted in its use to educational activities, excluding all filming of movies by motion picture studios. We know of no other constitutional provision that would require a school district to make available school property for the filming of a movie.

We thus conclude in answer to the first question that a school district may refuse to allow any filming of movies on school property by motion picture studios.

2.          Subject Matter of Commercial Movies

The second question concerns a school district's exclusion of certain movie projects from being filmed on school property due to their content.

In addition to the previously stated assumptions, we assume for purposes of the second question that the school district has selectively rented out its school facilities to motion picture studios in the past and would like to continue doing so in the future. Such rental is for the sole purpose of enhancing school district revenues so as to provide additional funding for school-related programs. Accordingly, while the district would not be limiting school property to the use for which the property was primarily intended (i.e. the education of students), neither would it be acting with the purpose of providing a public forum for expressive activity.

expressive activity.

To determine the degree to which the district may be selective as to the movies it will allow to be filmed on school grounds, we must first examine the nature of the forum that is created when a school district allows such filming to take place. The basic forum analysis was set forth in *Perry Ed. Assn.* v. *Perry Local Ed. Assn.* (1983) 460 U.S. 37:

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which `have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' [Citation.] In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. [Citation.] The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. [Citations.]

"A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. [Citations.] Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. [Citation.]

"Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the `First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' [Citation.] In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. [Citation.] As we have stated on several occasions, `[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" [Citations.]

In *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 802-803, the court explained:

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. [Citation.] Accordingly, the court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. [Citation.] The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. . . ."

The foregoing principles were applied to school facilities in *Hazelwood School District* v. *Kuhlmeier*, *supra*, 484 U.S. 260, where the court stated that First Amendment claims must be considered "in light of the special characteristics of the school environment." (*Id.* at p. 266, quoting *Tinker* v. *Des Moines Indep. Community School Dist.* (1969) 393 U.S. 503, 506.) The court found that the school-sponsored newspaper in question was not intended to serve as a public forum and held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive

activities so long as their actions are reasonably related to legitimate pedagogical concerns." (484 U.S. at 273, fn. omitted.)

In *Planned Parenthood* v. *Clark County School Dist.* (9th Cir. 1991) 941 F.2d 817, the court of appeals found the reasoning of *Hazelwood* to be applicable to the situation in which an outside entity seeks advertising space in school-sponsored publications. In addition to considering whether the policies and practices of the school indicated a lack of intent to open the school publications to indiscriminate use by the general public, the court also looked to the nature of the government property involved:

> "Both *Hazelwood* and *Cornelius* instruct that we also examine the nature of the government property involved in determining whether the forum is public or non-public. *Hazelwood*, 484 U.S. at 266. *Cornelius*, 473 U.S. at 806. *Cf*, *Greer*, 424 U.S. at 838. (`[T]he business of a military installation [is] to train soldiers, not to provide a public forum'). High schools foster learning experiences inside and outside the classroom and serve pedagogical as well as in locus parenti purposes. For this reason, educators have the right to control expressive activity that students, parents and other members of the public `might reasonably perceive to bear the imprimatur of the school.' *Hazelwood*, 484 U.S. at 271." (941 F.2d at 825.)

In light of the school's policy in accepting advertising in school-sponsored publications, and its practice of retaining control and requiring prior approval, the court concluded that the *Hazelwood* standard of a "clear intent to create a public forum" had not been met and that the school-sponsored publications were not public forums. (*Ibid*.)

The court went on to reject Planned Parenthood's argument that the school district had in effect created a limited public forum for public advertising of goods and services that are lawfully available to high school age audiences. It stated:

> "We agree that a high school may create a public forum or designate a forum of limited purposes. *Hazelwood* does not say otherwise, but it does constrain the analysis by requiring that courts focus on unique attributes of the school environment and recognize broadly articulated purposes for which high school facilities may properly be reserved. 484 U.S at 270-73. We also agree that this case differs from *Hazelwood* in that Planned Parenthood is an outside entity seeking to advertise in school publications, whereas *Hazelwood* concerned students who wanted to have their articles published. It is likewise true that the schools solicited and accepted an array of advertising, including some for casinos which Planned Parenthood suggests belie the district's concern for the propriety of material for a teenage audience, and some for providers of health services to whom Planned Parenthood analogizes itself. Yet we believe these points misdirect the inquiry, which the Supreme Court has instead focused on the schools' intent. While relevant factors in evaluating intent, none compels a different result in this particular case." (941 F.2d at 825-826, fns. omitted.)

With regard to the distinction that the school was soliciting advertising from outside entities rather than simply regulating the speech of students, the court made the following observation:

> ". . . Although the facts of *Hazelwood* dealt with student expression, its rationale was not so limited. The Court specifically spoke in terms of `school-sponsored publications, theatrical productions, and other expressive activities,' 484 U.S. at 271, and remarked on a school's ability to regulate reasonably the speech not only of students but also `teachers, and other members of the school community.' *Id.* at 269, 408 S.Ct. at 569. The publication is the same and the audience is the same, whether the source for the speech is from inside the school or outside, or is paid or free. The school has the same pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, no matter who the speaker is." (*Id*. at p. 827.)

avoiding the appearance of endorsing views, no matter who the speaker is." (*Id.* at p. 827.)

The court then reached its holding as to the framework under which the case would be decided:

> ". . . Under *Hazelwood*, in cases such as this where school facilities have not intentionally been opened to indiscriminate expressive use by the public or some segment of the public, school officials retain the authority reasonably to refuse to lend the schools' name and resources to speech disseminated under school auspices." (*Id.* at p. 828.)

Before proceeding to consider whether the school's justification for refusing to publish Planned Parenthood's advertisement was reasonable, the court further discussed the nature of a high school's mission as being critical to the court's analysis of both the nature of the property involved and the justification for the restrictions imposed:

> "The Court in *Hazelwood* made a number of important statements about the nature of a high school's mission. Its discussion on the measure of school officials' authority over school-sponsored publications informs our analysis of both the nature of the government property involved and the justification for the restrictions imposed.
>
> "The Court drew a critical distinction between a school's obligation to `tolerate' particular personal expression that happens to occur on the school premises, such as that addressed in *Tinker*, and `educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students parents, and members of the public might reasonably perceive to bear the imprimatur of the school.' *Hazelwood*, 484 U.S. at 270-71. When `school-sponsored' speech can fairly be characterized as part of the schools' mission, which the Court defined broadly, the first amendment affords educators `greater control' in deciding when the school will affirmatively `promote' or `lend its name and resources' to particular speech. *Id.* at 271-72. The Court recognized that school authorities have legitimate educational interests in assuring that `participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.' *Id.* at 271. Moreover, the school must retain the authority to refuse to sponsor speech that might reasonably `associate the school with any position other than neutrality on matters of political controversy.'" *Id.* at 272.
>
> "These characteristics help define what a school is about, and we must put the decision to exclude Planned Parenthood advertisements in that context. . . ." (*Ibid.*)

As previously noted "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." (*Cornelius* v. *NAACP Legal Defense & Ed. Fund*, *supra*, 473 U.S. at 802.) The court found the school's justification for refusing to publish Planned Parenthood's advertisement to be both reasonable and viewpoint neutral. (941 F.2d at 830.) For reasons which were supported by the court, the school considered the advertisement to be too sensitive and controversial. (Id. at 829.) The school district ensured viewpoint neutrality by subsequently enacting guidelines excluding advertising that pertains to "birth control products and information." (Ibid.)

We believe the analysis contained in *Planned Parenthood* provides the correct framework for determining the proper resolution of any First Amendment issues presented here. First, with respect to the type of forum involved, we are here concerned with school property in general, not a specific venue. The district has not, by policy or by practice, made school property in general available for "indiscriminate use by the general public." (*Perry Education Assn.* v. *Perry Local Educators' Assn.*, *supra*, 460 U.S. at 47.) Aside from the Civic Center Act, which is not at issue here, permission of the school or the district must be

obtained before extra-curricular uses, such as the filming of a movie, may be made of school property. School property as a whole is not, by tradition or designation, a public forum and the district here has not demonstrated a "clear intent" to turn its property into one. The school's general infrastructure is, in this respect, no different than the post office sidewalk that was deemed to be a nonpublic forum in *United States* v. *Kokinda*, *supra*, 497 U.S. 720. Although some filming had been permitted in the past, "selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." (*Cornelius* v. *NAACP Legal Defense & Ed. Fund*, *supra*, 473 U.S. at 805.) School facilities used as mere props are not like municipal theaters, which have been characterized as "public forums designed for and dedicated to expressive activity." (*Southeastern Promotions Ltd.* v. *Conrad* (1975) 420 U.S. 546, 555.)

We recognize that a school-sponsored publication is not involved here, as it was in *Hazelwood* or *Planned Parenthood*. However, the fact that permission must be granted by the school before a commercial filming project may be undertaken on school property tends to give such projects the imprimatur of the school. Any expressive activity on school grounds by outside parties, apart from that allowed by the Civic Center Act, is subject to intense scrutiny by concerned parents, teachers, and administrators, and to intense curiosity by the students. The local media and the local citizenry in general might also be expected to have a keen interest in any Hollywood-type production being created in their community. Given such circumstances, the school tends to become, at least on a local level, closely identified with the particular movie being made on its premises. Thus, for purposes of First Amendment forum analysis, we see little difference between an outsider's advertisement in a school-sponsored newspaper and a movie studio's school-sanctioned filming project on school grounds. In each instance, the issue is "educators' authority over school-sponsored publications, theatrical productions and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." (*Hazelwood School Dist.* v. *Kuhlmeier*, *supra*, 484 U.S. at 271.) **Footnote No. 5**

Having determined that we are dealing here with a nonpublic forum, rather than a traditional or designated public forum, we proceed to apply the relevant access test: "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral." (*Cornelius* v. *NAACP Legal Defense & Ed. Fund, supra*, 473 U.S. at 806.) For example, distinctions based on whether the movie resulting from the filming activity will receive a "PG-13" or an "R" rating are particularly appropriate for educators to make when deciding whether to permit the filming on school grounds. **Footnote No. 6** As was stated in *Planned Parenthood*, "School authorities . . . have legitimate educational interests in assuring that . . . readers or listeners are not exposed to material that may be inappropriate for their level of maturity . . ." (*Planned Parenthood* v. *Clark County School District*, *supra*, 941 F.2d at 828.) The school district's "basic educational mission . . . includes promoting `moral improvement' and teaching students to refrain from the use of profane and vulgar language. (Cal. Const., art. IX, § 1; California Code of Regulations, Title 5, section 300; section 44806.)" (*Lopez* v. *Tulare Joint Union High School Dist.* (1995) 34 Cal.App.4th 1302, 1329.)

The natural curiosity of students about the role of *their* school in a new movie would provide a strong impetus for them to go to the theater and see the movie when it is released and/or later buy a copy of the movie on videotape. **Footnote No. 7** Thus, by allowing the R-rated film to be shot on its property, the school would be placing itself in the position of promoting material that many parents would find objectionable for viewing by their children. **Footnote No. 8**

In any event, the district's own mandate to foster "moral improvement" and teach students to refrain from the type of language that might be heard in an R-rated movie constitutes "a valid pedagogical objective." (*Lopez* v. *Tulare Joint Union High School Dist., supra*, 34 Cal.App. 4th at 1329.) **Footnote No. 9** School authorities may thus appropriately decide that they should not encourage students to see an R-rated movie (or, in the case of elementary school children, a PG-13 movie as well) by allowing it to be filmed on school grounds. **Footnote No. 10**

If, beyond concerns about age-appropriate material, the school district wishes to avoid being placed on one side of a controversial issue, it may reasonably decide not to allow *any* movie dealing with that subject to be filmed on school grounds. Again, as stated in *Planned Parenthood* v. *Clark County School District*, *supra*, 941 F.2d 817:

"A school's decision not to promote or sponsor speech that is unsuitable for immature audiences, or which might place it on one side of a controversial issue, is a judgment call which *Hazelwood* reposes in the discretion of school officials and is afforded substantial deference." (*Id.* at p. 829.)

The second prong of the test for restricting access to a nonpublic forum -- viewpoint neutrality -- can also be met by the school. In making distinctions based on age-appropriateness, the filmmaker's particular viewpoint (e.g., "pro-choice" or "pro-life") is irrelevant -- a film involving certain subjects would not be suitable for younger audiences regardless of the filmmaker's viewpoint about the subject. **Footnote No. 11** Similarly, even if the material was age-appropriate, the school could decide that the issue treated in the movie is simply too controversial for the school to be associated with. A total exclusion of film projects dealing with that issue, if such policy is reasonable in light of the school's mission, would be a permissible viewpoint neutral approach. (See *Muller by Muller* v. *Jefferson Lighthouse School, supra*, 98 F.3d at 1542; *Church on the Rock* v. *City of Albuquerque* (10th Cir. 1996) 84 F.3d 1273, 1279-1280 [discussion of the distinction between content discrimination and viewpoint discrimination.] **Footnote No. 12**

As school administrators must have some degree of flexibility in determining the appropriateness of allowing the school to become associated with a particular movie, we believe that they may also make distinctions as between films which will carry the same rating or deal with the same subject, provided that they do so for identified pedagogical reasons and not because they favor one viewpoint over another for political or other non-pedagogical reasons. For example, two screenplays may involve a similar degree of violence, but one may be approved for filming on school property because it imparts a valuable moral lesson about the need for peaceable resolution of disputes, while the other is denied such filming rights because it uses the violence in a gratuitous manner. **Footnote No. 13** The same types of distinctions are routinely made by school administrators when they decide which books will be included in the school library, which may also be considered a nonpublic forum. **Footnote No. 14** We recognize that such distinctions may sometime become highly subjective, but the school's educational mission, which is the fundamental concern in such matters, does not lend itself to a definitional straightjacket. (See *McCarthy* v. *Fletcher* (1989) 207 Cal.App.3d 130, 148-149 [criteria for evaluating curriculum material require "some subjective interpretation"].) **Footnote No. 15**

We conclude that a school district which permits commercial motion picture studios to film movies on school property may deny permission to film certain movies based solely upon their content so long as its actions are reasonably related to legitimate pedagogical concerns. **Footnote No. 16**

\* \* \* \* \*

---

**Footnote No. 1**
Government Code section 65850.1 authorizes cities and counties to adopt ordinances governing the use of property for occasional commercial filming on location.
**Footnote No. 2**
All references hereafter to the Education Code are by section number only.
**Footnote No. 3** Under this legislative scheme a school district may generally rent out its facilities (§ 40043, subd. (b)) for any "purposes deemed appropriate by the governing board" (§ 40041, subd. (b)(7)).
**Footnote No. 4** We are not here concerned with commercial free speech. Commercial speech is "speech that *proposes* a commercial transaction." (*Board of Trustees of the State University of New York, et al.* v. *Fox* (1989) 492 U.S. 469, 482.) The movie-making project here is simply "speech for a profit." (Ibid.)
**Footnote No. 5**
A  h  l        d  bli  ti    th        hi l f      i  i  t  i        f      bli  f

A school- sponsored publication or other narrow vehicle for expression is not a sine qua non of a nonpublic forum on school grounds. The entire school may be considered a nonpublic forum, as in *Muller by Muller* v. *Jefferson Lighthouse School* (7th Cir. 1996) 98 F.3d 1530, where an elementary school student sought to distribute nonschool materials during noninstructional times. The court considered the school facilities in general as being a nonpublic forum (*id.*, at pp. 1539-1540) and held that a school could reasonably require the prescreening of a proposed handout in order to ensure its consistency with legitimate pedagogical concerns. (*Id.*, at p. 1542.)

**Footnote No. 6**

The Rating Board of the Motion Picture Association of America ("MPAA") has adopted a rating system that includes:

"PG-13: `Parents Strongly Cautioned. Some Material May Be Inappropriate For children Under 13.'

"PG-13 is thus a sterner warning to parents to determine for themselves the attendance in particular of their younger children as they might consider some material not suited for them. Parents, by the rating, are alerted to be very careful about the attendance of their under-teenage children.

"A PG-13 film is one which, in the view of the Rating Board, leaps beyond the boundaries of the PG rating in theme, violence, nudity, sensuality, language, or other contents, but does not quite fit within the restricted R category. Any drug use content will initially require at least a PG-13 rating. In effect, the PG-13 cautions parents with more stringency than usual to give special attention to this film before they allow their 12-year olds and younger to attend.

"If nudity is sexually oriented, the film will generally not be found in the PG-13 category. If violence is too rough or persistent, the film goes into the R (restricted) rating. A film's single use of one of the harsher sexually-derived words, though only as an expletive, shall initially require the Rating Board to issue that film at least a PG-13 rating. More than one such expletive must lead the Rating Board to issue a film an R rating, as must even one of these words used in a sexual context. These films can be rated less severely, however, if by a special vote, the Rating Board feels that a lesser rating would more responsibly reflect the opinion of American parents.

"PG-13 places larger responsibilities on parents for their children's moviegoing. The voluntary rating system is not a surrogate parent, nor should it be. It cannot, and should not, insert itself in family decisions that only parents can, and should, make. Its purpose is to give prescreening advance informational warnings, so that parents can form their own judgments. PG-13 is designed to make these parental decisions easier for films between PG and R.

"R: 'Restricted, Under 17 Requires Accompanying Parent Or Adult Guardian.'

"In the opinion of the Rating Board, this film definitely contains some adult material. Parents are strongly urged to find out more about this film before they allow their children to accompany them.

"An R-rated film may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above, so that parents are counseled, in advance, to take this advisory rating very seriously. Parents must find out more about an R-rated movie before they allow their teenagers to view it." (Jack Valenti, Motion Picture Association of America, "The Voluntary Movie Rating System" (1994) http://www.mpaa.org/ratings.html.)

**Footnote No. 7**

Although the rating of the movie may require that the student be accompanied by a parent or adult guardian, the fact remains that concerned parents will be placed in the position of having either to accompany their children to see the film or resist the youngsters' entreaties that they be permitted to see the film. Creating this dilemma for the parent can exacerbate tensions in the school-parent partnership and thereby make it more difficult for the school to fulfill its educational mission. (Cf. *Planned Parenthood* v. *Clark County School Dist.*, *supra*, 941 F.2d 817, 829-830.)

**Footnote No. 8**

While ratings are ordinarily assigned upon completion of the film, school authorities would presumably have the opportunity to review the script in advance of the filming. The Rating System contains rather specific criteria and the school authorities would be able to make comparisons with rated films with which they were already familiar.

**Footnote No. 9**

"[Legitimate] `pedagogical concerns' include not only the structured transmission of a body of knowledge in an orderly environment, but also the inculcation of civility (including manners) and traditional moral, social, and political norms." (*Muller by Muller* v. *Jefferson Lighthouse School, supra*, 98 F.3d at 1540, citing *Hazelwood, supra*, 484 U.S. at 273.)

**Footnote No. 10**

In *Borger v. Bisciglia*, (E.D. Wis. 1995) 888 F.Supp. 97, the plaintiff student brought a First Amendment civil rights suit against the defendant school board because the latter refused to allow the movie "Schindler's List" to be shown as part of the high school curriculum. The board had based its decision on a policy which precluded the showing of any R-rated movies. This policy was in turn based on a "`legitimate pedagogical concern' -- that [the district's] students not be subjected to movies with too much violence, nudity, or `hard' language." (*Id*. at p. 100.) The court articulated the central issue as "whether the defendants can rely on the MPAA rating system, instead of upon their own viewing of the film, in order to exclude it from the curriculum due to language  violence  and nudity " (*Ibid* ) It determined that the school board could

exclude it from the curriculum due to language, violence, and nudity." (*Ibid*.) It determined that the school board could "choose to use the ratings system as a filter of films" because "relying on the ratings is a reasonable way of determining which movies are more likely to contain harsh language, nudity and inappropriate material for high school students . . . An R-rating indicates that reasonable people could determine that high school students should not view the film. [Citation.] That reasonableness is all that is necessary in a high school setting. This is a constitutional exercise of school board discretion . . ." (*Id.* at 100-101.)

**Footnote No. 11**

In *Borger v. Bisciglia, supra*, 888 F.Supp. at 100, the school authorities' concern that its students not be subjected to movies with too much violence, nudity, or "hard" language was considered by the court to be "a viewpoint - neutral, non-ideological reason for a facially neutral policy and a viewpoint -neutral application of that policy."

**Footnote No. 12**

In 79 Ops.Cal.Atty.Gen. 196 (1996), we were presented with another issue involving the exercise of First Amendment rights in a school-sponsored forum, i.e. -- paid commercial advertising solicited by a high school for placement on the fence surrounding the school baseball field. We determined that it was unreasonable for the school to exclude advertising having a religious perspective since such exclusion was not required by the Establishment Clause and the import and sponsorship of the advertising was highly unlikely to be misconstrued by high school students. We also determined that the exclusion would be an impermissible form of viewpoint discrimination. Unlike the situation in our 1996 opinion, the rejection of the filming project here is based on a reasonable concern by the school regarding its educational mission and does not involve viewpoint discrimination.

**Footnote No. 13**

Section 44806 provides: "Each teacher shall endeavor to impress upon the minds of the pupils the principles of morality, truth, justice, patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship, . . . to teach them to avoid idleness, profanity, and falsehood, and to instruct them in manners and morals and the principles of a free government."

**Footnote No. 14**

Notwithstanding the fact that both works involve violence and certain adult themes, there can be little question that "Hamlet, Prince of Denmark" belongs in a middle school library while "Prince of Tides" does not.

**Footnote No. 15**

However, in order to avoid establishing any precedents which could be construed as an intent by the school to create a public forum or serve as a basis for a subsequent allegation of viewpoint discrimination, the district or the school should consider the adoption of guidelines which would be applicable to all requests for permission to do commercial filming on school property. See *McCarthy v. Fletcher, supra*, 207 Cal.App.3d at 147-148 ["the true motives of the school board members must be examined to answer a First Amendment challenge"].)

**Footnote No. 16**

We would apply the same analysis and reach the same conclusion under the California Constitution. (See *Lopez v. Tulare Joint Unified School Dist., supra*, 34 Cal.App.4th 1302.)