EDMUND G. BROWN JR. Attorney General DIANE E. EISENBERG Deputy Attorney General
THE HONORABLE SANDRÉ R. SWANSON, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
In light of the repeal of Education Code section 52900, effective January 1, 2006, may a school district contract with a private nonprofit organization to provide at-risk student dropout prevention and retention programs?
 CONCLUSION
A school district may contract with a private nonprofit organization to provide at-risk student dropout prevention and retention programs. *Page 2 
 ANALYSIS
We are asked to consider the effect of the repeal of Education Code section 52900 on a school district's authority to contract with a private nonprofit organization to provide dropout prevention and recovery programs. Former Education Code section 52900 was part of an article titled "Alternative Education and Work Centers for School Dropouts,"[1]
and expressly authorized school districts to contract with private nonprofit community-based organizations to provide alternative education and work programs for students who are at risk of dropping out of schools.[2] We conclude that, despite the repeal of section 52900, school districts do still have authority to contract for such services.
Repeal of Section 52900 and Institution of Pupil Retention Block Grant
Before it was repealed, section 52900 provided that a school district could establish an Alternative Education and Work Center, and specified that such a center could be established "at a continuation high school or adult school, or the district may contract with a private nonprofit community-based organization to provide the center."[3] The statute required Alternative Education and Work Centers to "[t]each basic academic skills, with an emphasis on the improvement of student motivation for achievement in order to obtain employment or return to the regular high school."[4] To that end, the statute required centers to "[o]perate on a clinical, client-centered basis," including individualized diagnostics and goal-setting, and to provide a combination of classroom and vocational instruction.[5] *Page 3 
Thus, under section 52900, school districts were expressly authorized to contract with private nonprofit organizations to provide Alternative Education and Work Centers. Did the repeal of the statute remove school districts' authority to enter into such contracts? No. We conclude that the same bill that repealed section 52900 also extended the authority to enter into such contracts, as we shall now explain.
In 2004, the Legislature passed Assembly Bill 825, [6] which repealed statutes authorizing 22 different categorical aid programs, including the Alternative Education and Work Centers program, [7] and consolidated their funding into six different block grants. A block grant allows the recipients to shift funds among any of the programs that have been consolidated into that block. When the Alternative Education and Work Centers program was repealed it was rolled into the new "Pupil Retention Block Grant."[8] Pursuant to newly added section 41506, the Pupil Retention Block Grant includes funding that was previously apportioned to school districts for various dropout prevention and recovery programs, including former section 52900.[9]
Nothing in the statutes creating the Pupil Retention Block Grant specifically authorizes a school district to contract with a private nonprofit community-based organization to provide an alternative education and work center for school dropouts, but we have no doubt that the authority still exists. We find it in section 41505, which authorizes a school district to spend Pupil Retention Block Grant funds for "any purpose authorized by the programs listed in Section 41506 as the statutes governing those programs read on January 1, 2004."[10] Dropout prevention and recovery in general, and section 59000 in particular, are among the programs listed in Section 41506.[11] And, as of *Page 4 
January 1, 2004, section 52900 expressly authorized a school district to contract with a private nonprofit community-based organization to provide such a center.
It is a well-settled principle that, in the adoption of one statute, the provisions of another statute may be adopted by reference and become a part of the adopting statute.[12] By referring to the "purpose[s] authorized by the programs listed . . .", and by listing the relevant programs by their statute numbers, the Legislature adopted the substance of the repealed statutes by reference. The Legislature did not need to restate those statutes word for word in order to carry on their effects. In our view, sections 41505 and 41506 clearly and effectively express the Legislature's intent to continue the authority that school districts had under the Alternative Education and Work Centers program (and the other programs rolled into the block grant), while reforming the funding structure of those programs.
Accordingly, we conclude that, despite the repeal of section 52900, a school district that receives funds in the form of a Pupil Retention Block Grant[13] is authorized to use those funds to contract with a private nonprofit community-based organization to provide an Alternative Education and Work Centers for School Dropouts.
Education Code Sections 35160 and 35160.1
Furthermore, and independent of the authority that a school district may exercise under the Pupil Retention Block Grant program, we believe that a school district generally has authority to contract with a private nonprofit organization to provide Alternative Education and Work Centers, or other dropout programs, pursuant to the broad powers granted to them under the Education Code.
School districts have broad general authority, derived from both the Constitution and the Legislature, to conduct their affairs. In 1972, the California Constitution was amended to add a provision stating that, "The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which *Page 5 
school districts are established."[14] The Legislature implemented this provision by enacting section 35160, which states:
 On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established.
Section 35160.1 additionally provides:
 (a) The Legislature finds and declares that school districts, county boards of education, and county superintendents of schools have diverse needs unique to their individual communities and programs. Moreover, in addressing their needs, common as well as unique, school districts, county boards of education, and county superintendents of schools should have the flexibility to create their own unique solutions.
 (b) In enacting Section 35160, it is the intent of the Legislature to give school districts, county boards of education, and county superintendents of schools broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective.
 (c) The Legislature further declares that the adoption of this section is a clarification of existing law under Section 35160.
These statutes establish that the Education Code is a permissive body of law, and that it is not necessary to find express authority in a particular statute for each and every action that a school district might wish to take, so long as the action furthers educational purposes and is not in conflict with, inconsistent with, or preempted by any law.[15] *Page 6 
Courts have held a variety of school district contractual and financial arrangements to be authorized by sections 35160 and 35160.1, [16] and we have also approved a variety of arrangements under the general grant of authority provided by these statutes, as well as under parallel provisions that apply to community college districts.[17]
Providing dropout prevention and recovery programs is clearly an action that is consistent with the purposes for which school districts are established. Indeed, the state has created a variety of dropout programs to be implemented at the district level. Therefore we have no hesitation in concluding that, as a general matter, school districts are authorized to contract out for dropout prevention programs.
Of course, "the flexibility provided by section 35160 is not without limits."[18] As one court of appeal has explained, "the generalized sentiment in section 35160.1 is of no *Page 7 
help in determining how much, if any, flexibility the Legislature has provided under a specific statutory scheme. Section 35160.1 is a clarification of section 35160, which in turn provides flexibility to `act in any manner which is not in conflict with or inconsistent with, or preempted by, any law. . . .' Thus, its application begins after the meaning of `law' . . . is ascertained."[19] Accordingly, when a school district wishes to contract with a private nonprofit organization to provide dropout prevention and recovery services, it must identify all laws[20] that might affect the desired agreement, and determine whether any of them would preclude or limit the agreement. We have previously commented that, "[i]n this regard . . . a school district's control over a program or activity may be precluded by the preemptive existence of another comprehensive statutory plan."[21]
Having surveyed the laws for purposes of this opinion, we are aware of none that specifically prohibits a school district from contracting with a private nonprofit organization for the provision of a dropout prevention and recovery program. The general authority of section 35160 thus appears to extend to such a contract. Nevertheless, the validity of any particular contract must necessarily depend on its unique circumstances.
With respect to funding, for instance, categorical program funds, which may come from various state and federal sources, are appropriated for specified purposes and are subject to specified restrictions on their use. Thus sections 35160 and 35160.1 would not permit the use of categorical program funds for unauthorized purposes or in violation of program requirements.
Or, to take another example, if a school district's contract with a private nonprofit organization involved contracting for services in non-academic positions, such as clerical, maintenance, transportation, and cafeteria services, the contract might be inconsistent with or limited by Education Code section 45103.1, which prescribes the conditions under which a school district may enter into a new contract after January 1, 2003 for personal services ordinarily performed by classified employees of the school *Page 8 
district.[22] Moreover, even if statutory law presents no impediment to a school district contracting for the provision of dropout programs, such a contract might violate the district's collective bargaining agreement with its employees. And a school district's contract with a private organization must not run afoul of the prohibition expressed in California Constitution article IX, section § 6, which states that, "No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System." A public school system's courses of study and teaching function may be delegated to a private organization without violating article IX, § 6, but only "if done under the control and supervision of the school district."[23]
We raise these issues not to provide an exhaustive list, but merely to illustrate a few of the considerations that might arise in determining whether the general authority granted by sections 35160 and 35160.1 is in conflict with, inconsistent with, or preempted by, any law. The application of these sections will depend on the facts of each particular case.[24] *Page 9 
Accordingly, we conclude that a school district may contract with a private nonprofit organization to provide at-risk student dropout prevention and retention programs.
[1] Educ. Code §§ 52900-52904 (repealed by 2004 Stats. ch. 871 (Assembly 825), operative Jan. 1, 2006.) Further references to the Education Code are by section number only.
[2] Although the terminology in the Education Code is not uniform, dropout programs are typically described as either "prevention programs," which aim to prevent students who are in school from dropping out, or "recovery programs," which aim to return to school students who have already dropped out. The term "retention" refers to the percentage of time a pupil spends in his or her assigned classes at school. Tardiness, truancy, and other conduct, in addition to dropping out of school, affect a school's retention rate. "At-risk" students are those who are considered most likely to drop out of school, or not to return to school after dropping out.
[3] § 52900.
[4] Id. at subd. (a).
[5] Id. at subds. (b), (c).
[6] 2004 Stats. ch. 871.
[7] Id. at § 22. A "categorical aid program" is one under which funding is provided to schools for specific educational purposes, in addition to the general purpose funding each school receives according to its average daily attendance. Each categorical aid program carries its own specific criteria for eligibility, and rules regarding the use of the funds provided for that program.
[8] Id. at § 7. Statutes governing the Pupil Retention Block Grant have since been amended in ways not relevant to this analysis. See 2005 Stats. ch. 402 (Assembly 1136). See also 2009 Stats. ch. 2, § 15 (AssemblyX4 2) (providing additional flexibility among categorical aid programs, including Pupil Retention Block Grant, for fiscal years 2008-09 through 2012-13).
[9] § 41506(f)(1).
[10] § 41505(b).
[11] § 41506(f).
[12] Greene v. Town of Lakeport, 74 Cal. App. 1, 9 (1925);see also Don v. Pfister, 172 Cal. 25, 27-28 (1916).
[13] Only those districts that received funding in 2003-04 for any program now included in the Pupil Retention Block Grant, and that continued to participate in the program in 2004-05, are eligible for Pupil Retention Block Grant funds. See § 41505(a).
[14] Cal. Const. art. IX, § 14 (as amended Nov. 7, 1972, operative July 1, 1973).
[15] 65 Ops.Cal.Atty.Gen. 326, 327-328 (1982); see also Serv.Employees Intl. Union Loc. 715 v. Bd. of Trustees of the W.Valley/Mission Community College Dist., 47 Cal. App. 4th 1661, 1667
(1996) (construing § 70902(a), which confers parallel authority on community college districts); T.H. v. San Diego Unified Sch. Dist.,122 Cal. App. 4th 1267, 1281 (2004) ("Absent a specific statutory limitation, a school district `is free to act as it sees fit within the purposes for which it was established.'" (quoting Las Virgenes EducatorsAssn. v. Las Virgenes Unified Sch. Dist., 86 Cal. App. 4th 1, 12
(2001)).
[16] See, e.g., Dawson v. E. Side Union High Sch. Dist.,28 Cal. App. 4th 998, 1046 (1994) (school district may enter into contract to show current events videos containing commercial advertising in school); Howard Jarvis Taxpayers Assn. v. Whittier Union High Sch.Dist., 15 Cal. App. 4th 730, 734-735 (1993) (school districts may form recreation districts, and improvement and maintenance districts, to finance improvements to school facilities); Cal. Sch. Employees Assn. v.Kern Community College Dist., 41 Cal. App. 4th 1003, 1013 (1996) (district may contract with private groundskeeping service).
[17] See, e.g., 63 Ops.Cal.Atty.Gen. 851, 853 (1980) (school district may grant repurchase option to seller in school property acquisition contract); 65 Ops.Cal.Atty.Gen. 326, 327 (1982) (school district may enter into exclusive photography contract for school yearbook pictures);76 Ops.Cal.Atty.Gen. 46, 50 (1993) (district may agree to employment contract with superintendent of schools that requires lump-sum payment for unused sick leave upon superintendent's retirement);73 Ops.Cal.Atty.Gen. 84, 86 (1990) (district may establish and operate junior high school program for one of its component elementary districts for exclusive attendance by student residents of that district);85 Ops.Cal.Atty.Gen. 49, 54 (2002) (school district may pay for printing, handling, translating, and mailing trustee candidate statements contained in voter's pamphlet); 88 Ops.Cal.Atty.Gen. 46, 50 (2005) (community college district may use district funds to hire consultant for purpose of evaluating likelihood of electorate's approval of bond measure).
[18] Hartzell v. Connell, 35 Cal. 3d 899, 915 (1984).
[19] San Rafael Elementary Sch. Dist. v. State Bd. of Educ.,73 Cal. App. 4th 1018, 1027 (1999).
[20] For purposes of sections 35160 and 35160.1, "law" includes valid administrative regulations. Hartzell, 35 Cal. 3d at 917.
[21] 84 Ops.Cal.Atty.Gen. 5, 9 (2001); see also Cumero v. Pub. Empl.Rel. Bd., 49 Cal. 3d 575, 591 (1989) (noting that despite broad powers conferred by sections 35160 and 35160.1, "the local districts are denied control over many aspects of teachers' terms of employment by detailed provisions in the Education Code governing such matters").
[22] Most school employees are either "certificated" or "classified." Certificated positions, such as classroom teaching and other education positions, are those for which a state credential is required. §§ 44006, 44013. Classified positions do not require certification qualifications, and are generally non-academic positions. §§ 45103, 45104.
[23] Cal. Teachers Assn. v. Bd. of Trustees, Fullerton Union High Sch.Dist., 82 Cal. App. 3d 249, 255 (1978).
[24] We note that the State Department of Education offers to provide advice about whether section 35160 authorizes specific activities. Section 33319.5 states:
 The State Department of Education may encourage among school districts, county boards of education, and county superintendents of schools the implementation of the authority granted to those agencies by Section 31560, including the rendering to those agencies, upon request, advisory opinions on whether a program, activity, or course of action is authorized by Section 35160. The department may publish and disseminate those opinions. *Page 1